# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* GREEN

Docket No. 162260. Argued April 4, 2023 (Calendar No. 1). Decided July 31, 2023.

The Judicial Tenure Commission (the JTC) filed a formal complaint against Third Circuit Court Judge Tracy E. Green, alleging that she covered up evidence of child abuse (Count I) and that she made false statements about her knowledge of the abuse (Count II). Respondent admitted she was aware that her son had slapped one of her grandsons, GD, across the face, and she further admitted that she covered the resultant handprint with makeup, claiming that she had done so after her other grandson, RD, had teased GD about the handprint. Respondent denied that the handprint was a bruise. Both grandsons testified that respondent was aware of multiple incidents in which their father's physical abuse left marks on them and further testified that no teasing had occurred regarding the handprint. In March 2019, respondent testified at a juvenile court hearing as a witness for her son; she denied that she had ever seen bruises on her grandsons' bodies but admitted to seeing the handprint on GD's face. Respondent also denied that any of her grandchildren had ever told her that they had been abused. The Michigan Supreme Court appointed retired Judge Betty R. Widgeon as master, and she issued a scheduling order providing for a virtual hearing. Respondent objected to the scheduling order and moved for in-person proceedings. The master denied the motion for in-person proceedings. In October 2021, disciplinary counsel moved the Supreme Court to clarify its position with respect to holding remote judicial disciplinary proceedings, and the Supreme Court denied the motion. Disciplinary counsel then sought leave to amend the formal complaint to add Count III, which alleged that respondent made knowingly false statements to the JTC in her answer to the formal complaint, and the master granted leave to amend the complaint. The master held a public hearing on several days between May 27, 2021 and November 21, 2021; all but two days of hearings and closing arguments were held virtually. The master concluded that respondent committed misconduct in office with respect to Counts I and II but not III. The JTC unanimously accepted and adopted the master's findings of fact and conclusions of law with respect to Counts I and II. Although the JTC was troubled by the allegations in Count III, it concluded that disciplinary counsel did not satisfy its burden of proving the allegations by a preponderance of the evidence. It therefore adopted the master's conclusion that there was insufficient evidence that respondent intentionally made false statements to the JTC in her answer. The JTC further concluded that respondent's misconduct violated MCR 9.104(1), (2), and (3); MCR 9.202(B); Michigan Code of Judicial Conduct Canons 2(A) and 2(B); and Michigan Rules of Professional Conduct Rules 8.4(b) and 8.4(c). The JTC addressed the factors set forth in *In re Brown*, 461 Mich 1291 (2000), and concluded that the totality of the factors

weighed in support of respondent's removal from office. Respondent petitioned the Supreme Court, requesting that the Court reject the JTC's recommendation and dismiss the amended complaint against her.

In a per curiam opinion signed by Chief Justice CLEMENT and Justices BERNSTEIN, CAVANAGH, WELCH, and BOLDEN, the Supreme Court *held*:

The JTC proved by a preponderance of the evidence that respondent knowingly covered up evidence of child abuse and violated MCR 9.104(1), (2), and (3), and MRPC 8.4(c). The JTC's finding that respondent lied under oath at the juvenile court proceeding was rejected; however, the JTC sustained its burden of proving that respondent knowingly made false statements about evidence of child abuse in her answer to the JTC's requests for comment. A six-month suspension without pay, along with a public censure, was imposed after consideration of the JTC's recommendation, the *Brown* factors, and similar and dissimilar judicial sanctions that have previously been imposed.

1. MCR 9.231(B) provides, in relevant part, that the master shall set a time and place for the hearing on the JTC's formal complaint. Respondent argued that the denial of her request for in-person hearings before the master violated due process and fundamental fairness. Assuming, without deciding, that MCR 9.231(B) was violated, any error was not sufficiently prejudicial to warrant relief, nor did it result in a miscarriage of justice. While GD's and RD's testimony was critical to the master's credibility determinations and the JTC's findings of fact, the master also possessed a substantial record of the boys' testimony from various interviews, the juvenile court hearing, and the criminal trial, which aided in any credibility determinations. Respondent was able to present a defense and to cross-examine GD and RD thoroughly and extensively during the virtual hearing. Additionally, respondent's testimony and cross-examination, the most critical parts of her defense, were conducted in person.

2. Const 1963, art 6, § 30 only allows the Supreme Court to take action against a judge on recommendation of the JTC. In this case, because the JTC did not recommend a finding of misconduct with respect to Count III, only the allegations of misconduct with respect to Counts I and II were addressed.

3. Respondent admitted to one instance of seeing a handprint on GD and covering it up with makeup. Regardless of whether the mark met the medical definition of a bruise, the slap to GD's face was hard enough that it left a visible mark on his face that respondent believed needed to be covered with makeup. Such an injury would be evidence tending to prove child abuse or a pattern of child abuse, even if the mark, by itself, would not be sufficient to prove child abuse under the applicable standard of proof. Moreover, both GD and RD credibly testified that they showed respondent marks and bruises left on their bodies by their father on more occasions than the single instance of which respondent has admitted she was aware. The master found that respondent put makeup on GD on multiple occasions to cover "marks" on GD's body after her son had hit or slapped GD. The master also found that on June 24, 2018, as the boys were being removed from the home of respondent's son, GD told police officers that he did not want to go with his grandmother because "she knew about what the dad was doing to them, about the abuse" and would allow their father to get the boys back. To find that respondent covered up evidence of

child abuse, it was not necessary that the evidence she covered up be admissible in court. Finally, respondent's explanation that she merely covered up the mark to stop RD from teasing GD about it was implausible. Accordingly, the JTC proved by a preponderance of the evidence that respondent knowingly covered up evidence of child abuse and violated MCR 9.104(1), (2), and (3), and MRPC 8.4(c).

4. In the context of JTC proceedings, both a misrepresentation and a misleading statement generally include an actual intent to deceive. The JTC's finding in this case that respondent lied under oath at the juvenile court proceeding was rejected. At that hearing, respondent testified that she had never used makeup to cover bruises on the boys' faces because she had never seen any bruises on the boys. Respondent consistently denied seeing any bruises, instead characterizing what she covered up as a "handprint" or a "mark." This distinction was relevant to determining whether respondent's statement at the juvenile court hearing was intentionally false. If respondent truly, subjectively believed that what she saw was not a bruise and no testimony was provided to suggest that such a belief was factually unreasonable based on other knowledge that she had, then her testimony during the juvenile proceeding was not intentionally false or misleading. Because there was no evidence that respondent believed the mark was a bruise at the time she testified, a preponderance of the evidence did not support the finding that she made a false statement at the juvenile court hearing. With regard to respondent's responses to the JTC's requests for comment, respondent admitted to, on a single occasion, being told that her son had slapped GD in the face, seeing what looked like a handprint on GD's cheek, and covering up that mark with makeup. Accordingly, the question was whether respondent, in not admitting to more than the single incident, exhibited an intent to deceive or a wrongful motive. Respondent's statement, repeated multiple times in response to the JTC's requests for comment, was more than merely careless or inattentive; it was made with, at a minimum, a wrongful intent to minimize the nature and extent of her conduct. Accordingly, the JTC sustained its burden of proving that respondent knowingly made false statements about evidence of child abuse in her answer to the JTC's requests for comment.

5. The allegations that respondent made false representations under oath at the public hearing were additional charges arising after the complaint was filed, and disciplinary counsel did not move to amend the complaint pursuant MCR 9.235. This lack of amendment in connection with the JTC's generalized conclusions that respondent lied under oath raised a concern that respondent was not provided with notice and a reasonable opportunity to respond to these allegations. Because the complaint was not amended to add these new allegations, no determination was made regarding whether the JTC demonstrated this count by a preponderance of the evidence.

6. MCR 9.252(A) provides that the Supreme Court may accept or reject the recommendations of the JTC or modify the recommendations by imposing a greater, lesser, or entirely different sanction. The JTC is entitled to deference with respect to its recommendations of sanction. The seven factors outlined in *In re Brown* that guide sanctions decisions in judicial discipline matters are: (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct; (2) misconduct on the bench is usually more serious than the same misconduct off the bench; (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety; (4)

misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does; (5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated; (6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery; and (7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. In this case, Factor 1 weighed in favor of a more severe sanction because the record established that respondent covered up evidence of child abuse more than the single time to which she admitted. Factor 2 weighed slightly in favor of a more severe sanction because respondent's misleading statement was made after she took the bench. Regarding Factors 3 and 4, there was no factual basis on which to weigh them in favor of a more serious sanction because the record did not support a finding that respondent's conduct actually did hinder the ability of others to discover the abuse. Factor 5 weighed in favor of a more serious sanction because respondent made the deliberate choice to cover the mark on GD's face with makeup and because the master determined that this conduct was intended to minimize the nature and extent of respondent's involvement. Factor 6 weighed in favor of a lesser sanction because respondent's misconduct under Count I occurred before any pending legal controversy and because her misleading statements to the JTC under Count II were made after respondent's son had been convicted and his parental rights terminated. Finally, Factor 7 weighed in favor of a lesser sanction because respondent's misconduct did not involve the unequal application of justice on the basis of a class of people. A nine-month sanction has been imposed for misleading statements that were not made under oath but related to conduct that occurred while the respondent was a sitting judge. A six-month suspension has been imposed in cases in which the respondent committed harassment or abuse of some nature while sitting as a judge. Here, however, respondent's misconduct was not related to her position as a sitting judge. The misconduct that occurred in this case was unique, and similar misconduct has not been addressed in the past. Considering the JTC's recommendation, the *Brown* factors, and similar and dissimilar judicial sanctions that have previously been imposed, a six-month suspension without pay was an appropriate sanction in this case. A three-month suspension would have been justified under Count I given that respondent's misconduct was conduct that occurred before she was on the bench, involved difficult family relationships, and involved respondent's covering up of evidence rather than participating in the abusive conduct. However, the finding of misconduct under Count II warranted the more severe sanction of a six-month suspension. The JTC's recommended sanction was modified accordingly.

JTC's recommendation modified; six-month suspension without pay imposed.

Justice BERNSTEIN, concurring, wrote separately to express his continuing concern about the use of video conferencing in JTC proceedings. Given the timing of the COVID-vaccination rollout and the minor children involved in the case who were not immediately eligible to receive vaccinations, he concurred with the majority, but he hoped that the JTC would honor an individual's preference for in-person proceedings going forward.

Justice ZAHRA, concurring in part and dissenting in part, agreed with the majority that respondent committed misconduct requiring the imposition of a sanction and agreed with Justice

VIVIANO's additional findings of misconduct but would have also considered respondent's false statements made under oath at the JTC misconduct hearing and accordingly would have imposed a much harsher sanction than that imposed in the majority opinion or recommended in Justice VIVIANO's partial concurrence and dissent. The JTC's alleged failure to amend the complaint to allege perjury during the JTC misconduct hearing had no effect on whether respondent told the truth at that hearing. The Supreme Court, as the final arbiter of alleged judicial misconduct in this state, should hold a respondent accountable for all the misconduct contained in the record, even that which is not specifically alleged as a basis for discipline in the JTC's complaint. It is folly to claim that the JTC deprived respondent of a fair opportunity to mount a defense to lying under oath during a proceeding designed to hold elected judges, not the general public, accountable. Respondent knew that by taking the oath, she was, in fact, required to tell the truth. Because respondent in this case should have been held accountable for perjury, the JTC's recommended sanction of respondent's removal from office was appropriate.

Justice VIVIANO, concurring in part and dissenting in part, agreed with the majority's findings of misconduct and conclusions of law but wrote separately for several reasons: (1) to place the JTC's investigation and proceedings in context, recognizing the serious abuse that occurred before the JTC's investigation—respondent's son severely and repeatedly beat his children, frequently leaving marks on them; (2) to address the procedural errors and irregularities that occurred during the public hearing—Justice VIVIANO would have held that MCR 9.231(B) refers to a physical location and thus would have held that the Zoom hearing violated the court rules, although, because the violation was not sufficiently prejudicial and did not result in a miscarriage of justice, he would not hold that respondent is entitled to a new, in-person hearing; (3) to explain why he disagreed with portions of the majority's findings of fact regarding Count I and would find additional instances of misconduct under this count—respondent was aware of the abuse, and on more than one occasion, she covered up the marks left on the children with makeup; (4) to explain why he did not find, in regard to Count II, that respondent made intentionally false statements under oath at the public hearing—a respondent-judge is entitled to notice of the charges and a reasonable opportunity to respond to them, but here the JTC did not amend the complaint to allege that respondent provided false testimony at the public hearing and failed to even identify precise statements from the public hearing that it believed were intentionally false; by waiting until the filing of the decision and recommendation in the Michigan Supreme Court, the JTC deprived respondent of a fair opportunity to mount a defense to this allegation; and (5) to explain why he disagreed with aspects of the majority's sanctions analysis and therefore would have imposed a twelve-month suspension instead of a six-month suspension—in particular, *Brown* Factors 3 and 4 weighed in favor of a more serious sanction, and a twelve-month suspension would be proportionate when considering prior judicial discipline cases.

# OPINION

Chief Justice:
   Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2023

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* TRACY E. GREEN, Judge 3rd Circuit Court.

No. 162260

BEFORE THE ENTIRE BENCH

PER CURIAM.

This case is before the Court on the recommendation of the Judicial Tenure Commission (the JTC) that respondent, Third Circuit Court Judge Tracy E. Green, be removed from office. Respondent has filed a petition for review requesting that we reject the JTC's recommendation and dismiss the amended complaint against her. We agree in part with the JTC that respondent committed certain misconduct, but we reject a number of the JTC's other findings of misconduct. Furthermore, we disagree with the JTC that removal from office is warranted. Instead, we conclude that a six-month suspension without pay, along with a public censure, is the appropriate sanction.

## I. FACTS

Respondent was elected as a judge of the Third Circuit Court in November 2018 and assumed office in January 2019. She has no history of misconduct.

Respondent has a son, Gary Davis-Headd, who has several children. Two of his children, GD and RD, resided with Davis-Headd during the period of time relevant to this case—April 2015 to June 24, 2018. On June 24, 2018, Child Protective Services (CPS) removed GD and RD from the home after a neighbor reported suspected child abuse. Davis-Headd's parental rights to all his children, including GD and RD, were terminated in June 2019. See *In re Davis-Headd/Prograis*, unpublished per curiam opinion of the Court of Appeals, issued September 10, 2020 (Docket Nos. 350042, 350043, and 350044). Davis-Headd was also convicted of two counts of second-degree child abuse, MCL 750.136b(3), with one count related to GD and the other to RD. See *People v Davis-Headd*, unpublished per curiam opinion of the Court of Appeals, issued January 6, 2022 (Docket No. 351635). Relevant to the present case is whether respondent knew about the abuse of her grandsons before June 24, 2018, whether she covered it up, and whether she made false statements regarding the abuse during these proceedings.

The parties dispute the extent of respondent's knowledge regarding specific instances of Davis-Headd's use of corporal punishment and whether respondent knew or reasonably should have known that the punishment had crossed the line into child abuse. Respondent admits that she was aware that on one occasion, sometime in late 2016 or the first half of 2017, Davis-Headd slapped GD across the face hard enough that it left a handprint. Respondent testified that she did not believe a single slap constituted abuse, although she thought that it was "inappropriate" and "unreasonable," but she qualified that

she was using these terms in the "everyday colloquial sense" as opposed to a legal sense. Respondent admitted to covering up the handprint with makeup. She also denied that the mark was a bruise, instead describing it as a pink handprint. She indicated that she put makeup on GD's face because she allegedly learned, on the same night she first saw the handprint, that RD had been teasing GD about the mark.

However, both boys testified[1] that respondent was aware of multiple incidents when Davis-Headd's physical abuse left marks on them, and both boys denied that RD had teased GD about the single handprint that respondent admitted knowledge of. During these proceedings, GD was initially unsure of whether respondent had seen any marks on his body but clarified that there was at least one instance in which respondent saw a handprint on his face and put makeup on it. When asked how many times in his whole life respondent had put makeup on his face, GD responded: "Not a whole lot, but I think it was more than one time, like twice or three times. It wasn't—it wasn't—it wasn't 50 times, but it was more than once." GD confirmed that he did not want her to put makeup on his face.

GD also testified that he had discussed with respondent the marks Davis-Headd had left on him and recalled a time when Davis-Headd was about to beat RD. GD testified that respondent had intervened and "asked him not to do it." GD further testified that although Davis-Headd "said he wasn't going to do it . . . [h]e still did it."

---

[1] We note that the events to which the boys testified took place several years before the instant JTC proceedings, that the boys had been interviewed numerous times, and that the boys had previously testified at both their father's criminal trial as well as in the proceedings leading to the termination of their father's parental rights. During these proceedings, the boys sometimes expressed an inability to remember precise details, and therefore, counsel often relied on prior transcripts and interviews to refresh their memory or impeach their testimony.

RD testified that he and GD told respondent that Davis-Headd was beating them and showed her marks on their bodies, including bruises on his legs and arms and bruises on GD's face. RD indicated that the boys told respondent about their father's actions "[p]retty much every time" they went to respondent's house, which was at least once a month. RD also affirmed that he had told respondent that his father used long belts and his hand to hit him. He indicated that respondent would put makeup on the marks if they were going out in public. He also remembered respondent putting makeup on him "[t]wo or three times" and indicated that she put makeup on GD more "because he had bruises on his face quite often." RD testified that respondent had put makeup on his arm but did not remember if she had put makeup anywhere else on him.

While the time frame of the disclosures that GD and RD discussed during their testimony was often vague, it is not disputed that the boys' alleged reporting of abuse and the covering up of evidence of such abuse occurred prior to respondent taking the bench in January 2019.

Respondent contends that the boys lack credibility on the basis that the disclosures of abuse the boys discussed did not happen and because their mother coached them to fabricate allegations of abuse in order to regain custody of them.

In March 2019, before her testimony in this matter, respondent testified at a juvenile court hearing as a witness for Davis-Headd. She denied ever being shown bruises on GD's body or ever seeing bruises on his body but admitted to seeing a handprint on his face that she knew was inflicted by her son. She also admitted to being aware that GD and RD had been disciplined with a belt. When asked if she had used makeup to cover bruises on the boys, specifically bruises on GD's face, she reiterated that she never saw any bruises.

4

The JTC sent respondent requests for comment in September 2019.[2]  Respondent denied seeing Davis-Headd ever strike the boys but acknowledged that she saw "what looked like a handprint" on GD's cheek one time.  Other than that single incident, she denied ever seeing a mark on the boys and indicated that she was not told that a mark had been left on the boys.  She denied that any of her grandchildren had ever told her they had been abused.  She acknowledged putting makeup on GD one time in an attempt to cover a mark left by a slap from Davis-Headd, indicating that GD had told her that RD was making fun of him because of the mark.

On November 10, 2020, the JTC filed a formal complaint against respondent, alleging two counts of misconduct: covering up evidence of child abuse (Count I) and making false statements about her knowledge of child abuse (Count II).  On March 5, 2021, this Court appointed the Honorable Betty R. Widgeon to serve as master.

Disciplinary counsel sought leave to amend the formal complaint to add Count III, which alleged that respondent made knowingly false statements to the JTC in her answer to the formal complaint.  The master granted the motion on October 28, 2021.

The master held a public hearing on a number of days between May 27, 2021 and November 21, 2021.  All but two days of hearings and closing arguments were heard virtually.[3]  The master concluded that disciplinary counsel had established by a

_____

[2] The JTC also sent respondent requests for comment in October 2019, but none of the allegations before the Court involves her responses to that set of requests.

[3] After the master issued a scheduling order providing for virtual hearings, respondent moved for in-person proceedings.  The master, however, denied the motion, and respondent did not appeal that decision.  The November 19, 2021 hearing at which respondent provided the bulk of her testimony was held in person.

preponderance of the evidence that respondent committed misconduct in office with respect to Counts I and II but not Count III.

The JTC unanimously accepted and adopted the master's findings of fact and conclusions of law with respect to Counts I and II. It also found additional facts that were not referenced in the master's report but that it believed supported findings of misconduct as to Counts I and II. Although the JTC was troubled by the allegations in Count III, it concluded that disciplinary counsel did not satisfy its burden of proving the allegations by a preponderance of the evidence. It therefore adopted the master's conclusion that there was insufficient evidence that respondent intentionally made false statements to the JTC, under penalty of perjury, in her answer. The JTC further concluded that respondent's misconduct violated MCR 9.104(1), (2), and (3); MCR 9.202(B); Michigan Code of Judicial Conduct Canons 2(A) and 2(B); and Michigan Rules of Professional Conduct Rules 8.4(b) and 8.4(c). Regarding the sanction recommendation, the JTC addressed the factors set forth in *In re Brown*, 461 Mich 1291, 1291-1293 (2000), and concluded that the totality of the "factors weighs in support of the imposition of the most severe sanction of removal."

Respondent filed in this Court a petition for review of the JTC's decision and recommendation, requesting that the Court reject the JTC's recommendation and dismiss the amended complaint against her.

## II. STANDARD OF REVIEW

We have previously explained:

> Judicial tenure cases come to this Court on recommendation of the JTC, but the authority to discipline judicial officers rests solely in the

6

Michigan Supreme Court. This Court reviews de novo the JTC's findings of fact, conclusions of law, and recommendations for discipline. The Court may accept or reject the recommendations of the JTC or modify them by imposing greater, lesser, or entirely different sanctions. The examiner has the burden to prove each allegation of judicial misconduct by a preponderance of the evidence. It is the JTC's, not the master's conclusions and recommendations that are ultimately subject to review by this Court. [*In re Simpson*, 500 Mich 533, 545-546; 902 NW2d 383 (2017) (cleaned up).]

## III. ANALYSIS

## A. PROCEDURAL ERRORS AND IRREGULARITIES OF THE PUBLIC HEARING

Respondent argues that denial of her request for in-person hearings before the master violated due process and fundamental fairness because in-person hearings are required to fairly assess the credibility of witnesses.[4] A similar argument was raised in *In re Morrow*. There we explained:

---

[4] Respondent makes four additional due-process arguments, none of which we find entitles her to relief. First, respondent argues that the JTC's dual role violates due process and fundamental fairness because disciplinary counsel performs both investigative and prosecutorial functions. We have rejected similar arguments in the past, most recently in *In re Morrow*, 508 Mich 490, 499-503; 976 NW2d 644 (2022). We conclude that there is nothing in the facts or circumstances of this case that renders it meaningfully distinguishable from *In re Morrow* for purposes of this argument.

Second, respondent argues that Disciplinary Counsel Lora Weingarden should have recused herself from respondent's investigation and JTC proceedings because of her role as the prosecutor assigned to a felony case against a relative of respondent's, a case Weingarden dismissed, when she was an assistant prosecutor. Respondent abandoned this issue by failing to cite any authority to support her position, so we decline to address it. See *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998). Moreover, the argument is insufficient to establish the existence of a conflict of interest.

Third, respondent contends that the JTC violated due process and fundamental fairness by failing to disclose exculpatory evidence to her, contrary to MCR 9.232(A)(1)(b). But the evidence at issue was not exculpatory and thus did not need to be disclosed to respondent.

7

Respondent also contends that by holding a virtual hearing, the master violated MCR 9.231(B), which states, in relevant part, "The master shall set a time and a place for the hearing . . . ." At the time of the hearing, Administrative Order No. 2020-19 was in place. Our Court had issued that order to provide guidance as to how best to proceed in light of the COVID-19 pandemic. That order encouraged courts to "continue to expand the use of remote participation technology (video or telephone) as much as possible to reduce any backlog and to dispose of new cases efficiently and safely." AO 2020-19, 505 Mich xcviii, xcix (2020). Even assuming, without deciding, that the court rule was violated, we are not convinced that such a violation would entitle respondent to a new hearing held in person, particularly when respondent largely admitted to the allegations against him and was able to thoroughly examine and cross-examine witnesses during the hearing. MCR 9.211(D) ("An investigation or proceeding under this subchapter may not be held invalid by reason of a nonprejudicial irregularity or for an error not resulting in a miscarriage of justice."). [*In re Morrow*, 508 Mich 490, 503 n 3; 976 NW2d 644 (2022).]

Respondent argues that the present case is distinguishable from *In re Morrow* because this case was largely a credibility contest between the respondent and RD and GD. We disagree. Assuming, without deciding, that MCR 9.231(B) was violated, any error was not sufficiently prejudicial to warrant relief, nor did it result in a miscarriage of justice. See MCR 9.211(D). While GD's and RD's testimony was critical to the master's credibility determinations and the JTC's findings of fact, respondent was able to present a

---

Finally, respondent argues that disciplinary counsel's use of the Wayne County Child Advocacy Center to conduct interviews with GD and RD violated due process and fundamental fairness, relying on MCL 722.628(6) and MCL 600.2163a. But MCL 722.628(6) merely requires the prosecuting attorney and the Department of Health and Human Services to establish procedures for involving law enforcement and children's advocacy centers; it does not preclude the uses of the facility that occurred in this case. And MCL 600.2163a is applicable only to certain prosecutions and proceedings under the Michigan Penal Code or Code of Criminal Procedure for crimes against persons under the age of 16, persons with a developmental disability, or vulnerable adults. MCL 600.2163a(2). JTC proceedings are not among any of those proceedings, so the statute does not apply to the JTC or interviews of potential witnesses that it might conduct.

defense and to thoroughly and extensively cross-examine the boys via Zoom, an online communications service that allows users to conduct video and audio conferences remotely. Moreover, the boys' virtual testimony in this hearing was not the only evidence on which the master based her findings. Transcripts and videos of the boys' multiple Kids-TALK interviews as well as transcripts of the boys' testimony at both the juvenile court hearing and the criminal trial were admitted as part of the record. Respondent's testimony and cross-examination, the most critical parts of her defense, were conducted in person. In light of the substantial record evidence before the master, we conclude that any alleged error in the master's decision to use Zoom for the hearings in this case was not so prejudicial that it violated respondent's due-process rights and did not result in a miscarriage of justice.[5]

## B. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Const 1963, art 6, § 30 only allows us to take action against a judge "[o]n recommendation of the judicial tenure commission . . . ." Because the JTC did not recommend a finding of misconduct with respect to Count III, we only address the allegations of misconduct with respect to Counts I and II. See *In re Mikesell*, 396 Mich

---

[5] We share Justice VIVIANO's concerns about irregularities surrounding the physical circumstances of the boys' testimony at the hearing, but we are not convinced that any of these irregularities resulted in prejudice to respondent or a miscarriage of justice. Transcripts of the hearings in this matter reflect that the master went to great lengths to ensure that all witnesses, including RD and GD, were not subject to outside influences while testifying. Beyond respondent's separate allegation that the boys were coached by their mother, the parties did not raise concerns that either RD or GD had been subjected to outside influences during their testimony in this matter.

517, 524-527; 243 NW2d 86 (1976) (declining to address allegations from the complaint that the master had found not proved and that were not part of the JTC's recommendation).

### 1. COUNT I: COVERING UP EVIDENCE OF CHILD ABUSE

The master found that respondent knowingly concealed evidence of child abuse prior to becoming a judge. The JTC adopted the master's findings and conclusions of law. The JTC additionally found that statements respondent made to a CPS investigator on the day the boys were removed from Davis-Headd's home further demonstrated that she had been aware of the abuse. We agree with the JTC in part and find that respondent covered up evidence that could be used in an investigation regarding child abuse.

In these proceedings, respondent admitted to one instance of seeing a handprint on GD and covering it up with makeup. Respondent maintains that the mark she saw was not a bruise and was, in fact, a "pinkish" red mark. Regardless of whether the mark met the medical definition of a bruise, the slap to GD's face was hard enough that it left a visible mark on his face that respondent believed needed to be covered with makeup. When testifying before the master, respondent described what she saw as "a faint, what looked like to me outline of some fingers. Not the whole hand, but at least three fingers." Such an injury would be evidence tending to prove child abuse or a pattern of child abuse, even if the mark, by itself, would not be sufficient to prove child abuse under the applicable standard of proof. Moreover, both RD and GD credibly testified that they showed respondent marks and bruises left on their bodies by their father on more occasions than the single instance of which respondent has admitted she was aware.

10

In Michigan, the use of corporal punishment is not prohibited by law. See MCL 750.136b. However, corporal punishment may cross the line and be considered child abuse if a parent or legal guardian exceeds the use of "reasonable force." MCL 750.136b(9); *People v Lawhorn*, 320 Mich App 194, 202; 907 NW2d 832 (2017) (noting that "in using physical discipline on a child, [a parent] must act in a manner that is reasonable and not excessive"); *People v Hicks*, 149 Mich App 737, 743-744; 386 NW2d 657 (1986) (noting that a statute may "prohibit discipline that is not reasonable"). The line between legally permissible corporal punishment and child abuse is highly dependent on the facts.[6]

While some of the master's factual findings do not establish that Davis-Headd engaged in child abuse or that respondent covered up child abuse,[7] one of the factual

---

[6] To be clear, we recognize that following the children's removal from Davis-Headd's home in June 2018, a court of law determined that RD and GD were abused by Davis-Headd. Davis-Headd had his parental rights terminated, was convicted of second-degree child abuse, and was sentenced to a term of imprisonment. While our decision is in no way intended to minimize the seriousness of Davis-Headd's conduct, it cannot be made with the benefit of hindsight. Rather, our decision in this matter is necessarily limited to what the JTC proved respondent knew and did prior to June 2018.

[7] That respondent was aware that Davis-Headd slapped and choked his wife, knew Davis-Headd used court-prohibited corporal punishment on GD and RD, knew Davis-Headd was a very stern disciplinarian, and was aware that Davis-Headd spanked the boys does not establish that Davis-Headd engaged in child abuse or that respondent covered up evidence of child abuse.

That respondent might have known that Davis-Headd smacked GD across the face hard enough to leave a handprint at least one time and knew that Davis-Headd used a belt on the boys, while enough to establish that David-Headd engaged in child abuse, does not establish that respondent knowingly covered up evidence of that abuse. While perhaps, morally, respondent should have reported these instances, being aware of corporal punishment and not reporting it or preventing it is simply not the same as covering it up. Notably, the times when it is alleged that respondent did not report child abuse, she was not a judge.

11

findings is sufficient to support that respondent covered up child abuse. The master found that respondent put makeup on GD on *multiple occasions* to cover "marks" on GD's body after Davis-Headd had hit or slapped GD. The master also found that on June 24, 2018, as the boys were being removed from the Davis-Headd home, GD told police officers that he did not want to go with his grandmother because "she knew about what the dad was doing to them, about the abuse" and would allow Davis-Headd to get the boys back. As noted, while corporal punishment is not necessarily child abuse, there is no legally recognized right to use corporal punishment that leaves marks on a child that last any longer than a *de minimis* period of time. MCL 750.136b(1)(e) (defining "physical harm" in the child-abuse statute as "any injury to a child's physical condition"); *Lawhorn*, 320 Mich App at 200-201; *Clark v Stone*, 998 F3d 287, 299-300 (CA 6, 2021) (noting a lack of authority to support the asserted "right to use corporal punishment that leaves marks"). Although MCL 750.136b(9) allows parents to take reasonable steps to discipline their children, including the use of reasonable force, corporal punishment that leaves lasting marks cannot be considered reasonable under the law.[8] In fact, Michigan courts have cited similar conduct

---

Additionally, we reject the JTC's finding that respondent revealed to a CPS investigator that she knew Davis-Headd was abusing RD and GD. According to the CPS investigator, respondent told her "that she knew her son was a very strong disciplinarian and she never thought that it was this bad[.]" The CPS investigator understood "it" to refer to abuse, but from our review of the record, it is equally plausible that respondent meant that she was unaware that Davis-Headd's use of corporal punishment had risen to the level of child abuse. Accordingly, a preponderance of the evidence does not support this aspect of the JTC's factual findings.

[8] Respondent argues that the master ignored the testimony of Nancy Diehl, a witness respondent called as an expert in child-protection law. Diehl testified that a slap that left a handprint alone is not evidence of child abuse. However, Diehl's testimony does not support the conclusion suggested by respondent. Diehl acknowledged that parents are

in support of convictions for child abuse and the termination of parental rights.[9] Accepting

this fact as found by the master, we agree that the JTC proved by a preponderance of the

evidence that respondent knowingly covered up evidence of child abuse and violated MCR

9.104(1), (2), and (3), and MRPC 8.4(c).[10]

---

legally permitted to discipline their children but also acknowledged that discipline that injures a child or leaves bad marks may constitute child abuse. Further, while Diehl testified that she, who had not practiced in juvenile court, had not seen a case where a slap to the face of a child that left a red mark was abuse, the cases cited in note 9 of this opinion, among others, suggest that it can be.

[9] See *People v Gregg*, 206 Mich App 208, 209; 520 NW2d 690 (1994) (affirming the defendant's conviction of child abuse for striking a child and causing "blood blisters, bruises, and a hand-shaped welt," with the marks of the abuse, though lightened, still visible on the child's face a week after the assault); *In re Cruz*, unpublished per curiam opinion of the Court of Appeals, issued September 14, 2017 (Docket Nos. 337297 and 337298), p 1 (affirming an order terminating the respondent-mother's parental rights when she "was substantiated for physical abuse of [her child] . . . when she left a 'slap handprint' and 'scratches on [the child's] face' "); *In re Carter*, unpublished per curiam opinion of the Court of Appeals, issued February 12, 2015 (Docket No. 321896), pp 1-2 (affirming an order terminating the respondent's parental rights after the respondent was criminally charged and pleaded guilty to fourth-degree child abuse for slapping the child and leaving a handprint); *In re Moiles*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2012 (Docket No. 309862), p 1 (affirming an order exercising jurisdiction over the minor children when the evidence included the fact that one of the children presented at the doctor's office with " 'a significant handprint across his face' "); *People v Bacon*, unpublished memorandum opinion of the Court of Appeals, issued December 19, 2006 (Docket No. 266337), p 1 (affirming a defendant's conviction for third-degree child abuse when the evidence included the fact that the defendant was " 'spanking' [the child] so forcefully that handprints and bruises were apparent on his buttocks").

[10] We reject the JTC's contention that respondent engaged in misconduct as it relates to her knowledge that Davis-Headd and his ex-wife were under a court order not to engage in corporal punishment. Respondent was under no legal obligation to report or prevent Davis-Headd from using corporal punishment in violation of the civil judgment of divorce. But even assuming that respondent was aware of the existence of the order—something she does not dispute—and should have suspected that Davis-Headd was engaging in corporal

13

Respondent contends that the master and the JTC improperly found misconduct under Count I by focusing on whether Davis-Headd used corporal punishment on GD and RD when the complaint alleged that respondent had covered up child abuse. Respondent notes that the complaint and the master never referred to a legal charge of child abuse or the elements of such a charge. Although it is undisputed that Davis-Headd has been convicted of two counts of criminal child abuse in connection with his conduct on June 24, 2018, respondent is correct that the JTC did not find that she covered up the crime of child abuse. But a finding that respondent covered up evidence of child abuse is not contingent on a finding that criminal child abuse has occurred. Evidence can exist to support a finding even if that evidence, by itself, is insufficient for the finder of fact to conclude that the allegation has been proved under the applicable legal standard—which, in the case of criminal child abuse, would be beyond a reasonable doubt. Additionally, to find that respondent covered up evidence of child abuse, it is not necessary that the evidence she covered up be admissible in court. Evidence may also be relevant during the investigative stage of a legal matter, such as during a police or CPS investigation. The mark that respondent admits to covering up would have been highly relevant to such an investigation, and if she had not covered it up, the police might have discovered Davis-Headd's abuse of RD and GD earlier than June 24, 2018.[11] Finally, we find implausible respondent's

punishment, we are aware of no legal or ethical rule that would have required her to seek enforcement of the order. Therefore, she cannot be disciplined on this basis.

[11] While not discussed or analyzed by the master or the JTC, this type of evidence may be relevant to a number of civil or criminal matters, including (1) a child custody proceeding, see MCL 722.23(k) (including as one of the best-interest factors whether domestic violence was directed against the child); (2) a proceeding to terminate parental rights, see MCL 712A.19b(3)(b)(*i*) (providing that a court may terminate parental rights if the parent caused

14

explanation that she merely covered up the mark to stop RD from teasing GD about it. Both boys credibly testified in these proceedings that no such teasing occurred, and it was respondent who first raised the specter of teasing in a phone call with GD while these proceedings were ongoing. Rather, we find it more likely than not that respondent covered the mark with makeup to hide it from individuals who might see it and report it to the police, CPS, or other appropriate authorities.

A preponderance of the evidence supports the finding that respondent covered up evidence of child abuse.[12] This was conduct prejudicial to the proper administration of justice, contrary to MCR 9.104(1) and MRPC 8.4(c); conduct that exposed the legal profession to obloquy, contempt, censure, or reproach, contrary to MCR 9.104(2); and conduct contrary to justice, ethics, honesty, or good morals, contrary to MCR 9.104(3).

## 2. COUNT II: FALSE STATEMENTS ABOUT KNOWLEDGE OF CHILD ABUSE

Count II alleges that respondent made false statements about her knowledge of the child abuse. The complaint alleged only two categories of false statements: (1) false

---

a physical injury to the child and there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home); see also MCL 712A.19b(3)(k)(*iii*); and (3) and various criminal charges, including child abuse, MCL 750.136b, and domestic assault, MCL 750.81.

[12] Respondent was an unsuccessful candidate for judicial office in 2016 but has maintained the same candidate committee. She filed to run in the 2018 election on April 24, 2018. It appears undisputed that the instance of respondent's covering up a slap mark occurred before April 24, 2018. Thus, although respondent had an active campaign committee, at the time of the incident during which she acknowledges covering a handprint with makeup, she was not pursuing a judicial campaign and was not subject to Code of Judicial Conduct, Canon 5 ("All judicial candidates are subject to Canon 1, Canon 2, Canon 4A-4D and Canon 7 of the Code of Judicial Conduct as applicable during a judicial campaign.").

15

statements made during the juvenile court hearing in March 2019 and (2) false statements made in respondent's responses to the JTC's September 2019 requests for comment. However, the master and the JTC also found that respondent made false statements in her testimony before the master at the public hearing. The JTC adopted the master's findings and conclusions of law and further concluded that respondent's misconduct violated Code of Judicial Conduct, Canons 2(A) and 2(B).

We have previously explained what constitutes a misrepresentation or misleading statement in the context of JTC proceedings as follows:

> A common definition of "misrepresent" is "to give a false or misleading representation of usu[ally] with an intent to deceive or be unfair[.]" Note that "misrepresent" is defined in terms of a "misleading" statement, which renders the meaning of "misleading" somewhat tautological. But a common definition of "mislead" is "to lead in a wrong direction or into a mistaken action or belief often by deliberate deceit[.]" These definitions make clear that both a misrepresentation and a misleading statement generally include an actual intent to deceive. While the definitions do not categorically exclude a lesser *mens rea*, we believe that respondent makes a solid point that "[i]t is inconsistent to find one without the other as both seemingly require a wrongful intent to misdirect." Even though there may be some instances in which a misrepresentation and a misleading statement are not based on an actual intent to deceive, we believe that, at a minimum, there must be some showing of wrongful intent. In this case, respondent merely speculated as to her intent, and other than the possibility that the guess was self-serving, which the Commission acknowledged and rejected, we cannot conclude that respondent's guess is akin to either a misrepresentation or a misleading statement. [*In re Gorcyca*, 500 Mich 588, 639; 902 NW2d 828 (2017), quoting *Merriam-Webster's Collegiate Dictionary* (11th ed).][13]

---

[13] Although our analysis was in the context of awarding costs under MCR 9.205(B), the definitions we applied are applicable here.

16

First, we reject the JTC's finding that respondent lied under oath at the juvenile court proceeding. At that hearing, respondent testified that she had never used makeup to cover bruises on the boys' faces because she had never seen any bruises on the boys. No follow-up questions were asked to clarify respondent's answers other than a question about whether it would be a lie if GD had testified to the contrary the prior day. Regardless of whether the mark that respondent admitted to covering up met the clinical definition of a bruise, we are not convinced that respondent believed it was a bruise when she testified at the juvenile court hearing. Respondent has consistently denied seeing any bruises, instead characterizing what she covered up as a "handprint" or a "mark." While this distinction does not preclude a finding that respondent covered up evidence of child abuse, it is relevant to determining whether respondent's statement at the juvenile court hearing was intentionally false. If respondent truly, subjectively believed that what she saw was not a bruise and no testimony was provided to suggest that such a belief was factually unreasonable based on other knowledge that she had, then her testimony during the juvenile proceeding was not intentionally false or misleading. Because there is no evidence that respondent believed the mark was a bruise at the time she testified, a preponderance of the evidence does not support the finding that she made a false statement at the juvenile court hearing.[14]

---

[14] The JTC has accused respondent of improperly using her legal training and "sophisticated mastery of language" to carefully answer only the questions asked of her rather than elaborate beyond the scope of the question. While any witness, whether a judge or not, must testify honestly while under oath, witnesses who are attorneys or judges are not required to abandon their legal knowledge and training in that effort. Using legal knowledge or choosing words carefully is permitted in legal proceedings.

17

Next, we turn to respondent's responses to the JTC's requests for comment. Respondent admitted to, on a single occasion, being told that Davis-Headd had slapped GD in the face, seeing what looked like a handprint on his cheek, and covering up that mark with makeup. The JTC argues that a preponderance of the evidence established that respondent covered up marks or bruises more than the single time she admitted to having done so. The master, finding the boys' testimony to be more credible than respondent's, agreed. On its face, respondent's statement, repeated multiple times in response to the JTC's requests for comment, is inconsistent with the master's finding and can, at a minimum, be fairly characterized as incomplete or imprecise.

We must next determine whether the JTC established that, in not admitting to more than the single incident, respondent exhibited an intent to deceive or a wrongful motive. In another case, *In re Simpson*, 500 Mich at 552-553, we concluded that some of the respondent's technically false statements pertaining to the specific times and dates of certain conversations were merely "careless" and "inaccurate information" and, therefore, not actionable misconduct.[15] But the Court also concluded that the respondent made an

---

[15] As the JTC has acknowledged previously:

> "[I]t is the Commission's conclusion that a false statement requires the speaker's knowledge that the statement is false and intended to deceive. The fact that a statement may be incorrect does not, by itself, render the statement 'false' within the context of a legal proceeding. It may be discredited, or deemed unworthy of belief, but given the limits of human memory and perception, as well as the limitations of language, it would be unfair to impute motives of deception or falsehood to everyone who says something that someone else finds incredible, or that proves to be incorrect.
>
> Selective memory does not equal falsehood; incorrect memory does not equal falsehood; imprecision in expression does not equal falsehood;

18

intentional misrepresentation or a misleading statement when his explanation of the nature of and reason for his conduct was contradicted by other evidence admitted in the proceedings. *Id*. at 554-555. We necessarily concluded that the respondent's explanation, proved to be unbelievable, was made with the intent to deceive or with a wrongful motive. Drawing from that precedent, we believe respondent's statement here was more than merely careless or inattentive; it was made with, at a minimum, a wrongful intent to minimize the nature and extent of her conduct. The boys' testimony in this matter is relevant. RD and GD credibly testified that respondent was aware of and had covered bruises or other marks of severe physical discipline on more than one occasion. Moreover, the boys' version of how the single instance to which respondent admitted occurred was dramatically different than respondent's—importantly, both boys denied that RD had ever teased GD about being slapped by their father, which was the sole reason respondent provided for covering up the handprint. Accordingly, we conclude that the JTC sustained its burden of proving that respondent knowingly made false statements about evidence of child abuse in her answer to the JTC's requests for comment.[16]

---

even an answer that one chooses to disbelieve does not equal a falsehood."
[*In re Gorcyca*, 500 Mich at 637.]

[16] As to respondent's answers that she was not aware of "abuse" or specifics about incidents of spanking, respondent consistently maintained that she did not believe that the handprint incident constituted abuse, was not made aware of other incidents of abuse or alleged abuse, nor could she recall specific occasions of her grandsons being spanked for misbehavior. Again, while the incident to which respondent admitted and the similar incidents described in the boys' testimony support a finding that respondent covered up evidence of child abuse, there is no evidence that respondent actually believed that the conduct constituted abuse and intentionally testified otherwise. Accordingly, we hold that

Finally, we turn to the most serious allegation—that respondent made false representations under oath at the public hearing.[17] These, of course, were additional charges arising after the complaint was filed; however, disciplinary counsel did not move to amend the complaint via the procedure outlined in MCR 9.235. Disciplinary counsel clearly knew how to use this rule, considering that counsel did amend the complaint during these proceedings to add Count III on the basis of respondent's formal answer to the complaint and testimony obtained from respondent midway through the proceedings. We have declined to address charges that are not formally charged in the complaint. See *In re Simpson*, 500 Mich at 549 n 20 (collecting cases). Because the complaint was never amended, Count II was limited to respondent's testimony in the juvenile court hearing and her responses to the JTC's requests for comment. This lack of amendment in connection with the JTC's generalized conclusions that respondent lied under oath[18] raises a concern that respondent was not provided with notice and a reasonable opportunity to respond to these allegations. Because the complaint was not amended to add these new allegations,

---

there is insufficient evidence to conclude that respondent had the necessary wrongful intent. See *In re Gorcyca*, 500 Mich at 639.

[17] Although the allegation that respondent made false statements in her response to the JTC's requests for comment is also a serious allegation, her responses were not made under oath, which stands in contrast to respondent's answer to the JTC's formal complaint that she submitted under penalty of perjury. A misrepresentation to the JTC that is not made under oath is less serious than one made under oath. See *In re Simpson*, 500 Mich at 553, 562-563.

[18] We note that the JTC identifies no precise statements from the public hearing that it believes were intentionally false and provides virtually no analysis to explain how it determined that any false statements made during the public hearing were intentionally false—as opposed to, for example, being attributable to faulty memory.

20

we decline to consider them further or make any determination of whether the JTC demonstrated this count by a preponderance of the evidence.

## C. SANCTION

The JTC recommended that respondent be removed from judicial office. After reviewing the record, we "may accept or reject the recommendations of the commission or modify the recommendations by imposing a greater, lesser, or entirely different sanction." MCR 9.252(A). The JTC is entitled to deference with respect to its recommendations of sanction. *In re Brown*, 461 Mich at 1292. "However, such deference cannot be a matter of blind faith, but rather is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline." *Id*.

In *Brown*, we established seven factors to guide sanctions decisions in judicial discipline matters:

[E]verything else being equal:

(1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

(2) misconduct on the bench is usually more serious than the same misconduct off the bench;

(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

21

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [*Id*. at 1292-1293.]

In this case, the JTC concluded that all but the seventh factor weighed in favor of a more severe sanction.[19] Because we reject a number of the JTC's findings of misconduct, our analysis of the *Brown* factors substantially departs from that of the JTC. First, because we find that the record establishes that respondent covered up evidence of child abuse more than the single time to which she admitted, Factor 1 weighs in favor of a more severe sanction. Second, respondent's misconduct with respect to Count I was conduct that occurred before she was on the bench, and so this factor weighs in favor of a lesser sanction. As to Count II, while respondent's misleading statement in response to the JTC's requests for comment pertained to conduct that occurred before she was on the bench and was not made under oath,[20] her statement was made after she took the bench, and so we conclude

---

[19] Regarding the second factor, the JTC initially argued that the factor weighed in favor of a more severe sanction but concluded that removal was warranted regardless of whether respondent's misconduct was on the bench.

[20] At times, we have held that "off the bench" misconduct may warrant a severe sanction under the second *Brown* factor. See *In re Adams*, 494 Mich 162, 181-182; 833 NW2d 897 (2013) (noting that the respondent-judge "did repeatedly testify falsely under oath in a courtroom, with all the gravity that such a venue should communicate, especially to a judge, in response to questions asked of her by a judge on the bench"). However, neither of the instances we conclude were demonstrated under Count I or Count II involved respondent attempting to leverage her position as a judge or testifying under oath.

22

that Factor 2 weighs slightly in favor of a more severe sanction. Third and fourth, although respondent's misconduct relative to Count I *could* have hindered the ability of others to discover the abuse that was occurring, the record in this case does not support a finding that respondent's conduct actually did hinder any such discovery, so we have no factual basis on which to weigh Factors 3 and 4 in favor of a more serious sanction. Relative to Count II, it is not clear how respondent's misrepresentation as to covering up evidence of child abuse more than one time caused prejudice to the actual administration of justice beyond what was caused by her admitted conduct. Fifth, we find that respondent made the deliberate choice to cover the mark on GD's face with makeup, so Factor 5 weighs in favor of a more serious sanction. The deliberate nature of respondent's false statement is more difficult to evaluate. While we understand that the subject at issue involved difficult family dynamics and that respondent's primary role in that dynamic was as a mother and grandmother, the master determined that respondent's conduct was deliberately intended to minimize the nature and extent of her involvement. Accordingly, this factor weighs in favor of a more severe sanction. Sixth, respondent's misconduct under Count I occurred prior to any pending legal controversy, and her misleading statements to the JTC that are the subject of Count II were made after Davis-Headd's trials had concluded, so Factor 6 weighs in favor of a lesser sanction. Finally, respondent's misconduct did not involve the unequal application of justice on the basis of a class of people, so Factor 7 weighs in favor of a lesser sanction. Overall, the factors weigh in favor of a lesser sanction than removal but not one at the lower end of the spectrum of sanctions we may impose.

The sanction imposed must be proportionate. "This Court's overriding duty in the area of judicial discipline proceedings is to treat equivalent cases in an equivalent manner

23

and unequivalent cases in a proportionate manner." *In re Simpson*, 500 Mich at 559 (quotation marks, citation, and ellipsis omitted). We have "consistently imposed the most severe sanction by removing judges for testifying falsely under oath." *In re Adams*, 494 Mich 162, 186; 833 NW2d 897 (2013). In this case, however, we have not found that respondent lied under oath. We have imposed a nine-month suspension for misleading statements that were *not* made under oath but related to conduct that occurred while the respondent was a sitting judge. See *In re Simpson*, 500 Mich at 563, 572 ("[W]hen a judge engages in misconduct by making an intentional misrepresentation or a misleading statement while not under oath . . . a lesser, though still serious, sanction may be warranted."). And in cases in which the respondents committed harassment or abuse of some nature while sitting as judges, we have imposed a sanction of a six-month suspension. *In re Morrow*, 508 Mich 490;[21] *In re Iddings*, 500 Mich 1026 (2017). Here, respondent's misconduct was not related to her position as a sitting judge.

Ultimately, while comparing different instances of judicial misconduct is an important tool in meting out proportionate discipline, such comparisons are "inevitably limited" based on contextual and factual dissimilarities. *In re Brown*, 461 Mich at 1294. The misconduct that occurred in this case is unique, and we have not addressed similar misconduct in the past. Considering the JTC's recommendation, the *Brown* factors, and similar and dissimilar judicial sanctions this Court has previously imposed, we conclude

---

[21] We further note that the judge at issue in *In re Morrow* had previously received lesser sanctions on multiple occasions before the conduct that led to the six-month suspension occurred.

24

that a six-month suspension without pay is an appropriate sanction in this case.[22] Regarding Count I, because the misconduct was conduct that occurred before respondent was on the bench, involved difficult family relationships, and involved respondent's covering up of evidence rather than participating in the abusive conduct,[23] a three-month suspension would be justified. However, the finding of misconduct under Count II warrants the more severe sanction of a six-month suspension. We find that the seriousness of respondent's misconduct falls closer to that which merited the nine-month suspension without pay imposed in *In re Simpson*. That said, we believe that a downward departure from that benchmark is warranted here because respondent has no history of other misconduct and because her statements did not relate to her conduct as a judge. We therefore conclude that a six-month suspension without pay, along with a public censure, is a proportionate sanction, and we modify the JTC's recommended sanction accordingly. See MCR 9.252(A).

---

[22] We recognize that this Court has held that a respondent's act of lying under oath categorically renders them unfit for office. See *In re Justin*, 490 Mich 394, 423-424; 809 NW2d 126 (2012); *In re Adams*, 494 Mich at 184-185. We question such a hard-and-fast rule that fails to take into account the specific facts of a case because "[t]he most fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently." *In re Brown*, 461 Mich at 1292. However, because we conclude that it is inappropriate to consider the JTC's findings that respondent lied under oath before the master in the absence of an amended complaint, we need not decide today whether to reconsider the inflexibility of the rule adopted in those cases.

[23] Although the JTC alleged that respondent's conduct in Count I violated criminal statutes regarding tampering with evidence and being an accessory after the fact of child abuse, the master did not find that the JTC sustained its burden in this regard.

## IV. CONCLUSION

Respondent's judicial misconduct warrants a serious sanction. But as explained earlier, the JTC's recommended sanction of removal from office is disproportionate to the misconduct that we have found. Instead, a public censure and six-month suspension are appropriate. Therefore, we modify the JTC's recommendation and order that the Honorable Tracy E. Green, Judge of the Third Circuit Court, be suspended without pay for six months, effective 21 days from the issuance of this opinion.

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

26

# S T A T E  O F  M I C H I G A N

## SUPREME COURT

*In re* TRACY E. GREEN, Judge 3rd Circuit
Court.

No. 162260

_____

BERNSTEIN, J. (*concurring*).

I write separately only to indicate my continuing concern about the use of videoconferencing in these situations going forward, which has been well documented over the years.  See *In re Morrow*, 508 Mich 490, 516; 976 NW2d 644 (2022) (BERNSTEIN, J., concurring); MSC Administrative Order, 507 Mich ___, ___ (July 26, 2021) (VIVIANO and BERNSTEIN, JJ., concurring in part and dissenting in part).  The proceedings in this case took place across several months in 2021, the same year that COVID-19 vaccinations were first made available to the general public.  Given the timing of the vaccination rollout, especially because this case involved minor witnesses who would not have been immediately eligible to receive vaccinations, I concur with the majority.  However, I hope that an individual's preference for in-person proceedings will be honored by the Judicial Tenure Commission going forward.

Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

*In re* TRACY E. GREEN, Judge 3rd Circuit
Court.

No. 162260

_____

ZAHRA, J. (*concurring in part and dissenting in part*).

The Judicial Tenure Commission (the JTC) recommends to the Court that respondent, Third Circuit Court Judge Tracy E. Green, be removed from office. The Court unanimously agrees that respondent committed misconduct. A majority of the Court "reject[s] a number of the JTC's . . . findings of misconduct" and "conclude[s] that a six-month suspension without pay, along with a public censure, is the appropriate sanction." Writing separately, Justice VIVIANO finds obvious additional instances of misconduct and concludes that a twelve-month suspension instead of a six-month suspension is appropriate. I agree with Justice VIVIANO's findings of misconduct and find the majority's refusal to acknowledge these additional instances of misconduct to be a disservice to the record as developed during these proceedings.

A majority of the Court correctly finds that respondent made knowingly false statements in her responses to the JTC's requests for comment. I part ways with my colleagues in regard to whether these same and similar false statements which respondent restated while testifying under oath at the JTC misconduct hearing should be considered additional misconduct. My colleagues, citing this Court's opinion in *In re Simpson*,[1] have

[1] *In re Simpson*, 500 Mich 533; 902 NW2d 383 (2017).

declined to address these allegations because they are not formally charged in the complaint.[2]  Apparently, "[b]ecause the complaint was never amended, Count II [false statements about knowledge of child abuse] was limited to respondent's testimony in the [hearing in which respondent's son had his parental rights terminated] and her responses to the JTC's requests for comment."  Because I fundamentally disagree with this common-law pleading approach to adjudicating JTC matters, I must dissent.  Even if the JTC had not found that respondent committed perjury, I would still independently consider a judicial officeholder's perjured testimony when setting an appropriate sanction.  Accordingly, I would impose a much harsher sanction than imposed in the majority opinion or recommended in Justice VIVIANO's partial concurrence and dissent.

In this case, respondent gratuitously admits to applying makeup to her grandson's face on a single occasion to conceal her son's "handprint," a mark illustrating the pain her son inflicted on the boy.  She insists that in doing so she was not covering up her son's child abuse because it was not a bruise but rather, in her words, "a faint, what looked like

---

[2] As in this case, a majority of this Court in *In re Simpson* likewise strayed into unpreserved and unpresented concerns relating to the lack of an amendment of the JTC complaint.  I maintain that our law today is better reflected by more recent decisions, such as *In re McCree*, 495 Mich 51, 81; 845 NW2d 458 (2014), *In re Adams*, 494 Mich 162, 184-185; 833 NW2d 897 (2013), and *In re Ferrara*, 458 Mich 350, 365-370, 372-373; 582 NW2d 817 (1998), than, for instance, a strained reading of a 45-year-old case like *In re Mikesell*, 396 Mich 517, 529; 243 NW2d 86 (1976).  See *In re Simpson*, 500 Mich at 577 n 2 (MARKMAN, C.J., concurring in part and dissenting in part).  See also Garner et al, The Law of Judicial Precedent (2016), p 300 ("A court of last resort generally follows its decision in the most recent case, which must have tacitly overruled any truly inconsistent holding.").  In *In re Mikesell*, the Court stated: "The Master found that the allegations of paragraphs 3–8 of the complaint were not proven.  They are not part of the recommendation of the Commission and will not be considered by this Court."  *In re Mikesell*, 396 Mich at 525-526.  *In re Mikesell* did not suggest that the Court was constitutionally "precluded" from considering the allegations.

2

to me [an] outline of some fingers. Not the whole hand, but at least three fingers." The Court correctly finds irrelevant whether the impression "met the medical definition of a bruise . . . ." The imprint to the boy's face was significant enough that respondent believed it needed to be covered with makeup. Such an injury would be evidence tending to prove child abuse or a pattern of child abuse, even if the mark, by itself, would not be sufficient to prove child abuse. Clearly, such a mark would draw the attention of anyone who cared for the boy and prompt additional inquiry that might have revealed further injuries, such as those found on June 24, 2018.[3]

_____

[3] Having suspicions and concerns of child abuse, CPS Investigator Leslie Apple (Apple) and Police Officer Melissa Adams (Officer Adams) spoke with respondent's grandsons in the upstairs of their home while other officers spoke with respondent's son outside the home. At that time, the boys showed Apple and Officer Adams various marks on their bodies and stated that their father had inflicted the marks. The boys did not want respondent to take custody of them that day. One of the boys explained to Apple and Officer Adams that he did not want to go with respondent because "she knew about what the dad was doing to them, about the abuse, and she would allow the dad to get them back and come and see them."

As Officer Adams testified:

I've been a police officer for Detroit for 13 years, and there are certain runs or certain instances that do stick out throughout my time. . . .

\* \* \*

. . . [T]he fear that you could see in [GD's and RD's] eyes and through their actions when they thought their father was coming up the stairs or when they thought they had to go with their grandmother, those stick out in your memory.

Ultimately, CPS decided to place the boys with someone other than respondent. This event began the investigation that resulted in respondent's son having his parental rights terminated. *In re Davis-Headd/Prograis*, unpublished per curiam opinion of the Court of Appeals, issued September 10, 2020 (Docket Nos. 350042, 350043, and 350044). Respondent's son was convicted of two counts of second-degree child abuse and sentenced to concurrent prison terms of 4 to 10 years. *People v Davis-Headd*, unpublished per curiam

3

Respondent explained to the JTC that she put makeup on the boy's face because she learned that his brother had been teasing him about the mark. This Court appropriately finds, as did the master and the JTC, that this explanation is not only implausible but entirely in contradiction to the boy's testimony. Respondent's blanket assertion that the boys were not credible simply cannot be accepted. The boys were clearly credible in their account of how they received their injuries on June 24, 2018. That each boy, and their sister, was able to explain their own multiple injuries and their brother's injuries is nearly incontrovertible. And that the boys, according to an experienced police officer, had "fear that you could see in their eyes and through their actions when they thought . . . they had to go with their grandmother" is highly persuasive evidence that the abuse had been going on for some time. There is no dispute that respondent's son repeatedly committed child abuse. Given this wealth of support, there is simply no reason not to believe the boys in regard to the abuse. I agree with Justice VIVIANO that "the evidence demonstrates that [respondent's son] severely and repeatedly beat his children, frequently leaving marks on them; that respondent was aware of the abuse; and that on more than one occasion, respondent covered up these marks with makeup."

In regard to respondent's false statements about knowledge of child abuse made to the JTC, disciplinary counsel focused on respondent's testimony at the hearing in which her son had his parental rights to all his children terminated (parental termination hearing) and, separately, respondent's written responses to the JTC's requests for comment. In

___

opinion of the Court of Appeals, issued January 6, 2022 (Docket No. 351635), p 1. Justice VIVIANO's opinion in this case provides a fair account of the ongoing child abuse that had been occurring on a regular basis for some time before June 24, 2018.

4

regard to respondent's testimony at the parental termination hearing, I agree with my colleagues that the JTC has not proved by a preponderance of the evidence that respondent made intentionally false statements during that proceeding. Respondent's testimony that the JTC asserts was false is better characterized as undeveloped and equivocal. In regard to respondent's written responses to the JTC's requests for comment, however, this Court correctly finds that respondent lied to the JTC by stating that she applied the makeup to the boy's face because his brother had been teasing him about the mark. I conclude, in addition, that respondent falsely claimed on multiple occasions in her responses that she was only aware of a single instance of abuse[4]

---

[4] Considering all of respondent's answers to the JTC's requests for comment, the most informative with regard to her false representation of her limited knowledge concerning the abuse are her responses to Question Nos. 19 and 38. In response to Question No. 38, respondent stated:

> I was never, under any circumstances or in any respect, aware of, or told by anyone, the details of alleged abuse of my grandsons at the hand of their father. Specifically, I was never advised about alleged abuse by my grandsons.

> Once in the past, [GD] told me that he had been slapped in the face by his father. I saw what looked like a handprint on his cheek at that time. During that discussion, [RD] confirmed that [GD] had been slapped by their father. My grandsons had also mentioned in the past that they had been spanked by their father for misbehaving.

> After being made aware of the slapping incident, seeing what looked like a handprint on the face of [GD], and considering it totally inappropriate and unacceptable, I immediately contacted my son and scolded him for doing so. I was satisfied that the issue had been resolved and appropriately remediated as improper and never to be repeated. I was never made aware of any subsequent corporal punishment. I did not consider that single

5

and that the boys did not tell her of the abuse.[5]

Additionally, I would conclude that respondent should be held accountable for false representations she made under oath at the JTC misconduct hearing. My colleagues

incident as something that should be reported to law enforcement, CPS, or any other entity.

As related to being spanked, I have no recall of any specific occasion that this was mentioned by my grandsons. I was not, however, aware of any specific situation or complaint from my grandchildren concerning being spanked for misbehavior. Further, I never saw any signs that my grandchildren had been spanked by their father.

In response to Question No. 19, respondent stated, in relevant part:

I did not, in any respect, apply make-up to "injuries" to prevent others from detecting "abuse" by my son. The extent of my involvement was specific and limited. Because [the boys] were at an age where they were constantly teasing one another, [one boy] told me that [his brother] was making fun of him for being slapped by his father and the mark on his cheek. I told [him] that I could apply some liquid foundation to his cheek to make the mark go away. I applied some foundation to . . . his cheek . . . , but it was not successful in covering up the mark.

[5] In this respect, I agree with Justice VIVIANO that

respondent's knowledge that [her son] committed domestic violence against his then-wife, used corporal punishment on [the boys] contrary to a court order, was a stern disciplinarian, and spanked the boys[ is relevant]. All this evidence supports the master's finding that respondent covered up evidence of abuse, because this evidence makes it much less likely that respondent would not have been concerned about child abuse when she saw the supposed mark." . . . [T]hat a court found it necessary to prohibit [respondent's son] from engaging in corporal punishment, yet he was unable to restrain his impulse to do so, might raise in a reasonable person's mind a concern that he was committing more-serious abuse. While this evidence alone might not meet the standard of proof for a criminal charge (beyond a reasonable doubt), in my view, all the evidence in this case, when considered together, proves by a preponderance of the evidence (the standard of proof in this civil proceeding) that respondent knew of the abuse.

conclude that because the complaint was never amended, Count II was limited to respondent's testimony in the parental termination hearing and her responses to the JTC's requests for comment. The majority opinion explains that "[t]his lack of amendment in connection with the JTC's generalized conclusions that respondent lied under oath raises a concern that respondent was not provided with notice and a reasonable opportunity to respond to these allegations."[6] I disagree.

At the outset, it should be noted that this is a judicial disciplinary proceeding, not a criminal proceeding. The constitutional rights that attach to one charged in a criminal proceeding simply do not attach to a judge charged with misconduct. More significantly, however, none of my colleagues explains why notice is relevant to the question whether respondent lied under oath during her JTC misconduct hearing.[7] Regardless of the

---

[6] As I understand it, my colleagues do not hold respondent accountable for her perjury before the master because the JTC did not amend the charges in the complaint to include perjury during the JTC misconduct hearing after that hearing was conducted. As developed in the main text of this opinion, it is hard to understand how such an amendment would provide respondent notice that her perjury would be actionable before this Court. Additionally, in proceedings before this Court, the JTC informed respondent that her false statements before the master would be an issue. See note 8 of this opinion.

[7] Justice VIVIANO claims that my "holding respondent accountable for lying under oath" in a JTC public hearing misses the point; yet the very point " 'of judicial discipline is not to punish but to maintain the integrity of the judicial process.' " *In re Simpson*, 500 Mich at 580 (MARKMAN, C.J., concurring in part and dissenting in part), quoting *In re Moore*, 464 Mich 98, 118; 626 NW2d 374 (2001) (emphasis omitted). I leave it to the public to discern whether Justice VIVIANO, quoting himself quoting Bolt, *A Man for All Seasons* (New York: Vintage Books, 1995), p 66, would have anyone believe that I would " '[c]ut a great road through the law to get after the Devil' " instead of naturally concluding that the Court is providing respondent a break. Again, this is not a criminal proceeding. It is folly to claim that the JTC deprived respondent of a fair opportunity to mount a defense to lying under oath during a procedure designed to hold elected judges, not the general public, accountable. Moreover, respondent's most palpable lies occurred when she lied under oath during her own nonadversarial, direct testimony when examined by her own counsel for

7

pleadings, respondent swore that her "testimony today will be the truth, the whole truth, and nothing but the truth . . . ." Is this not enough notice for any person—let alone a sitting circuit court judge who administers this same oath in her courtroom—that they are required to testify truthfully? Did respondent not know that by taking the oath, she was, in fact, required to tell the truth, the whole truth, and nothing but the truth? Surely, my colleagues must agree that the JTC's alleged failure to amend the complaint to allege perjury during the JTC misconduct hearing had no effect on whether respondent told the truth at that hearing. While under oath, respondent either told the truth or she did not. And here, respondent repeated during sworn testimony many of the falsehoods she made in response to the JTC's requests for comment.[8] The continued doubling down on falsehoods speaks volumes to the character of respondent, her unwillingness to accept responsibility for her wrongful conduct, and her fitness to serve in the judiciary.

I believe in this case "that the majority errs by failing to give weight to this misconduct, largely because the recommendation of the [JTC] to this Court did not

---

her perceived benefit. Respondent was not forced to lie; she chose to maintain this deceitful testimony before the master, insisting that the master, the JTC, and this Court believe her false testimony in an attempt to obtain a favorable outcome.

[8] I disagree with Justice VIVIANO that the JTC needs to identify precise statements from the JTC misconduct hearing that it believes were intentionally false. Nonetheless, the JTC did identify precise statements by pointing to respondent's testimony before the master in which she, by and large, makes the same false claims that she had made in her written responses to the JTC's requests for comment. By embracing and repeating these unquestionably false assertions before the master, as respondent did during her nonadversarial, direct testimony, it should be evident to all that she lied under oath.

specifically refer to the lies that nonetheless appear clearly in the record."[9] This Court must never forget that we are the final arbiter of alleged judicial misconduct in this state. We are the body that ensures the Michigan judiciary is trustworthy, honest, and singularly committed to the pursuit of justice. We are, and should be, held to the highest standards of accountability to the people of Michigan with regard to the overall conduct of the judicial branch of Michigan. A circuit court judge has lied under oath. Yet this Court stands aside and refuses to consider this perjury because the JTC did not inform that judge that she would be held accountable for lying under oath? Nonsense. The people of Michigan deserve more than to be left with the impression that this Court's first priority in JTC proceedings is to protect the judiciary, not the public. For the myriad reasons stated herein and articulated by then Chief Justice MARKMAN in *In re Simpson*, both prudential and constitutional, I conclude that this Court can and should hold a respondent accountable for all the misconduct contained in the record, even that which is not specifically alleged as a basis for discipline in the JTC's complaint.[10]

To the extent respondent is held accountable for her perjury, I would impose a much harsher sanction than imposed in the majority opinion or recommended in Justice VIVIANO's partial concurrence and dissent. Candidly, given the abundance of caselaw standing for the proposition that a judge who lies under oath is not fit to hold judicial office, I cannot help but conclude that the JTC has made a very compelling argument that respondent should be removed from office.

---

[9] *In re Simpson*, 500 Mich at 572 (MARKMAN, C.J., concurring in part and dissenting in part).

[10] *Id*.

In sum, this Court unanimously agrees that respondent committed misconduct. This Court also unanimously agrees to impose a sanction on respondent for this misconduct. I disagree with the majority of the Court that finds a six-month suspension adequate. I would consider the fact that respondent committed perjury during the JTC misconduct hearing and impose a much harsher and more appropriate sanction than imposed in the majority opinion.

Brian K. Zahra

*In re* TRACY E. GREEN, Judge 3rd Circuit
Court.

No. 162260

_____

VIVIANO, J. (*concurring in part and dissenting in part*).

I agree with much of the majority's opinion, including its findings of misconduct and conclusions of law. I write separately for several reasons: (1) to place the JTC's investigation and proceedings in context, recognizing the serious abuse that occurred prior to the JTC's investigation and respondent's knowledge of that abuse; (2) to address the procedural errors and irregularities that occurred during the public hearing and explain why I would find that holding the public hearing via Zoom violated our court rules; (3) to explain why I disagree with portions of the majority's findings of fact regarding Count I and would find additional instances of misconduct under this count; (4) to explain why I do not find, in regard to Count II, that respondent made intentionally false statements under oath at the public hearing; and (5) to explain why I disagree with aspects of the majority's sanctions analysis and would therefore impose a twelve-month suspension instead of a six-month suspension.

## I. FACTS

The majority lays out the facts and procedural history of *this* case—i.e., respondent's JTC proceedings. But I believe it is important that we recognize the context in which the JTC proceedings arose: the severe abuse that respondent's son, Gary Davis-

Headd, perpetrated against his children, including GD and RD, and respondent's knowledge of evidence related to the abuse at the time. In the appeals from the termination of Davis-Headd's parental rights and from his convictions for child abuse, the Court of Appeals detailed the horrific abuse the children endured:

> RD testified that he was beaten at least every other day. After the beating, he generally had bruises everywhere, but his face. Although GD and RD were the primary recipients of the abuse, DP advised that she was once beaten for wearing the wrong shoes, for accidentally pulling down DD's pants, and for not washing her hands properly. Additionally, DD was asked what a spanking was, and he said it meant getting hit with a belt everywhere, but the face. In the forensic interview, DD revealed that he could hear GD and RD being beaten because of the screams, and DD and KD, the two youngest children, were spanked on their hands. [*In re Davis-Headd/Prograis*, unpublished per curiam opinion of the Court of Appeals, issued September 10, 2020 (Docket Nos. 350042, 350043, and 350044), p 2 n 3.]

As the majority notes, RD and GD both testified that they repeatedly told respondent about the abuse and showed her the marks that Davis-Headd left on their bodies. They further testified that respondent covered up those marks on multiple occasions.

In addition to having his parental rights terminated, Davis-Headd was convicted of second-degree child abuse and sentenced to 4 to 10 years in prison, a sentence he is currently still serving. *People v Davis-Headd*, unpublished per curiam opinion of the Court of Appeals, issued January 6, 2022 (Docket No. 351635), p 1. Respondent was involved in Davis-Headd's defense during the parental rights termination case. She asked a friend to serve as Davis-Headd's attorney and assisted her in preparing for the trial, including telling her "what direction to go in with certain investigative issues," "who witnesses were," and "what laws she could use to support certain positions."

In other words, respondent was an active participant in Davis-Headd's defense and had significant knowledge of the details of the child abuse that ultimately led to the JTC proceedings against her. The majority frames this case as concerning "whether respondent knew or reasonably should have known that the punishment had crossed the line into child abuse." But there is no doubt that Davis-Headd's actions crossed well over the line into child abuse. That abuse was detailed in the parental rights termination case, Davis-Headd's criminal case, and the current JTC proceedings. As will be explained below, I agree with the JTC's findings that respondent was aware of the abuse and that on multiple occasions she covered up visible injuries that Davis-Headd left on RD and GD.

## II. PROCEDURAL ERRORS AND IRREGULARITIES OF THE PUBLIC HEARING

The majority assumes, without deciding, that MCR 9.231(B) was violated because the master held the public hearing via Zoom. As I indicated in *In re Morrow*, I would hold that "place" in MCR 9.231(B) "refers to a physical location," such that the master was required "to set a physical location for respondent's hearing." *In re Morrow*, 508 Mich 490, 510, 514; 976 NW2d 644 (2022) (VIVIANO, J., concurring).[1] Therefore, I would find that the master erred by holding a virtual hearing and by denying respondent's motion to hold her hearing in person. But, like in *In re Morrow*, I agree with the majority that this error was not sufficiently prejudicial and did not result in a miscarriage of justice, such that

---

[1] And I believe that there is wisdom in this requirement—for one thing, it hardly seems fair that a proceeding with the potential to remove (and, in this case, the stated goal of removing) a person from his or her position as a judge would be conducted without any of the participants assembling in the same room.

3

respondent is not entitled to a new, in-person hearing.  See *id*. at 514-515, citing MCR 9.211(D).[2]

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  COUNT I: COVERING UP EVIDENCE OF CHILD ABUSE

I agree with the majority's finding that respondent covered up evidence of child abuse when, as she admits, she used makeup to cover a handprint on GD's face.  But I disagree with two aspects of the majority's opinion with respect to Count I.  First, I find much of the discussion about legally permissible corporal punishment to be unnecessary.  This is not a case that was close to the line of permissible corporal punishment versus abuse.  Rather, the evidence demonstrates that Davis-Headd severely and repeatedly beat his children, frequently leaving marks on them; that respondent was aware of the abuse; and that on more than one occasion, respondent covered up these marks with makeup.[3]

---

[2] I also have concerns about a number of other irregularities: (1) RD testified from the house of his mother, whom respondent alleges coached the boys to fabricate the allegations they made about her knowledge of abuse; (2) GD and disciplinary counsel, who questioned GD on direct examination, were both present at the JTC's office when GD testified remotely at the public hearing, although they were in separate rooms; and (3) the JTC provided transportation for GD to its offices to testify.  These problems, which are inherent in the ad hoc, unprofessional, and largely unregulated nature of virtual legal proceedings, again illustrate the wisdom—centuries in the making—of conducting hearings where evidence is taken in a physical location with all the participants present.  See generally *People v Goree*, ___ Mich ___ (2023) (Docket No. 165010) (VIVIANO, J., concurring) (discussing the importance of conducting contested hearings at which testimony or evidence will be presented in person).

[3] Similarly, I find it perplexing that the majority disregards as irrelevant respondent's knowledge that Davis-Headd committed domestic violence against his then-wife, used corporal punishment on GD and RD contrary to a court order, was a stern disciplinarian, and spanked the boys.  All this evidence supports the master's finding that respondent covered up evidence of abuse, because this evidence makes it much less likely that respondent would not have been concerned about child abuse when she saw the supposed

4

Second, in addition to the single mark that respondent admits to covering up with makeup, I would find that respondent was aware of multiple instances in which Davis-Headd left visible injuries on RD and GD and that she covered them with makeup multiple times. In its findings of fact for Count II, the majority agrees with the JTC that respondent was untruthful when she admitted to only covering up a single mark with makeup. In doing so, the majority relies on the testimony of RD and GD.[4] Yet the majority limits its findings for Count I to the single incident to which respondent has admitted. Because I agree with the JTC and the majority that respondent was intentionally untruthful in her responses to the JTC's requests for comment when she stated that she only covered up a single mark on GD, I would also find for purposes of Count I that respondent covered up evidence of child abuse on multiple occasions.[5]

---

mark. For example, the fact that a court found it necessary to prohibit Davis-Headd from engaging in corporal punishment, yet he was unable to restrain his impulse to do so, might raise in a reasonable person's mind a concern that he was committing more-serious abuse. While this evidence alone might not meet the standard of proof for a criminal charge (beyond a reasonable doubt), in my view, all the evidence in this case, when considered together, proves by a preponderance of the evidence (the standard of proof in this civil proceeding) that respondent knew of the abuse.

[4] In its summary of the facts, the majority notes that the events about which the boys testified had taken place years before the JTC proceedings and that disciplinary counsel relied on prior transcripts and interviews to refresh the boys' memory and impeach their testimony. This is unsurprising and a common occurrence in many judicial proceedings.

[5] Additionally, I find preposterous respondent's argument that this Court must first find that criminal child abuse occurred prior to the date the children were removed from the home in order to find that respondent covered up evidence of child abuse. As the majority notes, even if certain evidence might be insufficient for a finder of fact to conclude that an allegation has been proved, that evidence may nevertheless support the allegation. And evidence need not be admissible in court to be relevant, particularly during the investigative stage. As a former family law attorney and now a judge, it is astounding that respondent seemingly takes the position that one should pay no attention to visible injuries on a child

5

## B. COUNT II: FALSE STATEMENTS ABOUT KNOWLEDGE OF CHILD ABUSE

I agree with the majority that the JTC has not proved by a preponderance of the evidence that respondent made intentionally false statements during the juvenile hearing.[6] I also agree that the JTC has proved by a preponderance of the evidence that respondent made knowingly false statements in her responses to the JTC's requests for comment.

As for the JTC's allegations that respondent made false representations under oath, I agree with the Court's decision not to consider them but believe that additional explanation is required to support that decision. The complaint itself did not allege that respondent lied under oath at the public hearing. The allegations in the complaint were only that respondent's testimony in the juvenile court hearing and her responses to the JTC's requests for comment were false. The complaint was never amended to allege that respondent made false representations under oath at the public hearing.[7]

In *In re Simpson*, 500 Mich 533; 902 NW2d 383 (2017), we similarly noted that the JTC's findings of misrepresentations were not alleged in the complaint. *Id*. at 548-549.

_____

unless he or she has definitive proof (at the very moment of the observation) that the child has been abused.

[6] While I agree with the majority that "[u]sing legal knowledge or choosing words carefully is permitted in legal proceedings," evasive testimony is not acceptable, whether it is informed by one's legal training or other life experience. Lawyers use their legal training to perform many services that are essential to a free society. But they should never use that training to parse language in order to mislead a tribunal. As Abraham Lincoln said, "[R]esolve to be honest at all events; and if in your own judgment you cannot be an honest lawyer, resolve to be honest without being a lawyer." 2 Basler, *The Collected Works of Abraham Lincoln* (New Brunswick: Rutgers University Press, 1953), p 82. See also Oath on Admission to the Bar, SBR 15, § 3 ("I . . . will never seek to mislead the judge or jury by any artifice or false statement of fact or law[.]").

[7] See MCR 9.235 ("The complaint may be amended . . . to set forth additional facts, whether occurring before or after the commencement of the hearing.").

6

The evidence on which the JTC relied was the answer to the complaint and the respondent's testimony at the public hearing. *Id.* at 549 n 20. We noted that MCR 9.213 (now MCR 9.235) establishes a procedure for amending the complaint and requires the respondent to be given an opportunity to respond. *Id.* We also noted that this Court and the JTC "have declined to address charges that are not formally charged in the complaint." *Id.* However, we declined to address whether an amendment was required because the respondent had not challenged the JTC's findings on that basis. *Id.* And, like the respondent in *In re Simpson*, respondent in the present case has not challenged the JTC's findings on the basis that it failed to amend the complaint after the public hearing. But I believe it is appropriate for us to decline to consider the allegations that respondent provided false testimony at the public hearing for two reasons.

First, *In re Simpson* was the first time this Court put the JTC on notice that amendment of the complaint may be required for this Court to consider misconduct that occurs during the public hearing. In the two cases we cited for the proposition that this Court has declined to address allegations not contained in the complaint, the JTC also did not address those allegations. See *In re Hocking*, 451 Mich 1, 4-5, 24; 546 NW2d 234 (1996); *In re Hague*, 412 Mich 532, 563 n 11; 315 NW2d 524 (1982). Thus, in addition to the allegations not being in the complaint, Const 1963, art 6, § 30 precluded us from considering those allegations because the JTC did not find and recommend a finding of misconduct with respect to those allegations. Const 1963, art 6, § 30 (allowing this Court to take action against a judge only "[o]n recommendation of the judicial tenure

7

commission").[8]  But in *In re Simpson*, like in the present case, the JTC found misconduct not alleged in the complaint and recommended that this Court also find that such misconduct had been proved.  Although we did not decide the issue in *In re Simpson*, the JTC was on notice about our concerns stemming from the lack of amendment of the complaint.[9]  Indeed, as the majority notes, the JTC was aware that it could amend the complaint on the basis of testimony respondent gave at the public hearing, as evidenced by the fact the JTC amended the complaint to add Count III and to revise some of the allegations in Counts I and II.  Yet none of those amendments alleged that respondent provided false testimony at the public hearing.

Second, in prior cases involving allegations of false statements at the public hearing, the JTC has specifically identified the allegedly false statements.  For example, in *In re Simpson*, the JTC's decision and recommendation identified and quoted from the transcript specific statements the respondent made at the public hearing that the JTC believed were false.  In the present case, the master found that respondent made statements in her testimony at the public hearing that were inconsistent with other testimony, but the master

---

[8] As the majority notes, this is the reason that we are precluded from addressing the allegations of misconduct contained in Count III in this case.  See also *In re Mikesell*, 396 Mich 517, 524-527; 243 NW2d 86 (1976).

[9] Indeed, in responding to the partial dissent's assertion that an amendment of the complaint is unnecessary for conduct arising during the course of the JTC proceedings, we explained:

> [R]ecognizing that JTC proceedings are concerned not with punishing criminality but with maintaining standards of judicial fitness, we note that the partial dissent's position is a little like saying that a criminal defendant need not be charged in an information or indictment with perjury for lying at his trial for larceny because a statute on the books makes perjury a crime. [*In re Simpson*, 500 Mich at 570 n 66 (quotation marks and citation omitted).]

never quoted or otherwise identified any particular statements from the public hearing transcript. By contrast, the master's findings regarding the juvenile hearing and responses to requests for comment identified the statements at issue by quoting them. In its decision and recommendation, the JTC adopted the master's findings and also referred to the specific statements in the responses to requests for comment and juvenile hearing testimony that it found were false.

But the JTC identifies no precise statements from the public hearing that it believes were intentionally false. Rather, the JTC (1) concludes that respondent intentionally lied when she clarified that her statement in the juvenile court hearing that she knew her son had spanked the boys "in the past" was referring exclusively to the time before he was ordered not to use corporal punishment on the boys; (2) concludes that respondent lied when she testified that she only became aware that her son was using a belt on the boys during, rather than before, the CPS investigation; and (3) observes that respondent's testimony is contradicted by the boys' testimony. Additionally, the JTC's decision and recommendation provides virtually no analysis to explain how it determined that any false statements respondent made during the public hearing were intentionally false—as opposed, for example, to being attributed to a faulty memory. Cf. *In re Gorcyca*, 500 Mich 588, 639; 902 NW2d 828 (2017) (addressing whether the JTC met its burden of proving a misrepresentation and observing that "[e]ven though there may be some instances in which a misrepresentation and a misleading statement are not based on an actual intent to deceive, we believe that, at a minimum, there must be some showing of wrongful intent"). Although respondent did not challenge the JTC's findings or recommendation on this ground, the need for clear findings to facilitate our review of the matter further weighs against this

9

Court making a credibility determination with respect to the allegation that respondent gave false testimony under oath at the public hearing.

Combined with the lack of an amendment of the complaint, the JTC's generalized conclusions that respondent lied under oath before the master might have been insufficient to provide respondent with notice and a reasonable opportunity to respond to this allegation. Cf. *In re Simpson*, 500 Mich at 569 (explaining that a "compelling reason to limit our review in JTC proceedings to allegations of misconduct found and recommended to us by the JTC is that a respondent judge is entitled to notice of the charges and a reasonable opportunity to respond to them").

In his separate opinion, Justice ZAHRA objects to providing this minimal due process to judges who are charged with committing misconduct, apparently preferring something more akin to a Star Chamber. Contrary to his assertions, this Court has long recognized that while JTC proceedings are not criminal in nature, its adjudications of unfitness must " 'rest[] on constitutionally permissible standards and emerge[] from a proceeding which conforms to the minimum standards of due process.' " See *In re Mikesell*, 396 Mich 517, 529; 243 NW2d 86 (1976), quoting *In re Kelly*, 238 So 2d 565, 569 (Fla, 1970). That does not seem controversial. Nearly 50 years ago, we rejected the argument that our court rules denied due process to a respondent-judge. See *In re Del Rio*, 400 Mich 665, 683; 256 NW2d 727 (1977) (noting that GCR 1963, 932, the governing court rule, "provide[d] a full panoply of procedural guarantees for adjudicating allegations of judicial misconduct" and that "[i]n respondent's case, the order for interim suspension was not entered until the respondent was given adequate notice and a reasonable opportunity to respond to both the complaint and the petition for interim suspension"). The Court observed that the

10

"[r]espondent was afforded full opportunity to be represented by counsel, to examine and cross-examine witnesses, to present evidence, to submit briefs and to argue his case before a master . . . ." *Id.*

Our current rules reinforce the principle that a respondent-judge is entitled to notice of and a reasonable opportunity to respond to the allegations of misconduct. For example, MCR 9.235 provides that "[i]f an amendment [of the complaint] is made, the respondent must be given reasonable time to answer the amendment and to prepare and present a defense against the matters charged in the amendment." That rule would be little consolation if the JTC was routinely permitted to find misconduct that was not alleged in the complaint or in an amended complaint. And the problem is only exacerbated here due to the JTC's failure to identify with precision the statements it believes were false.

In his jeremiad, Justice ZAHRA asks what is lost when the JTC is permitted to proceed without providing adequate notice that it intends to pursue an allegation that a respondent-judge lied under oath. The answer seems clear to me. The public hearing before the master is the only point in the proceedings at which a judge facing allegations of misconduct is guaranteed an opportunity to cross-examine witnesses and to present testimony and other evidence in support of his or her defense. The JTC could have amended the complaint and ordered an additional hearing before either itself or the master to take additional evidence as to whether respondent lied under oath at the public hearing. See MCR 9.243. This would have provided respondent an opportunity to present evidence on the issue. But by waiting until the filing of the decision and recommendation in this

11

Court, and not even then precisely identifying the statements at issue, the JTC deprived respondent of a fair opportunity to mount a defense to this allegation of misconduct.[10]

For these reasons and those given by the majority, I agree with the majority's decision not to consider or make a determination as to whether respondent lied under oath at the public hearing.

---

[10] Justice ZAHRA's assertions that we are not holding respondent accountable for lying under oath largely miss the point. As noted later in this opinion, I believe that removal is an appropriate sanction if we conclude that a judge lied under oath. But that conclusion can only be reached when there is procedural fairness in the adjudication process. Otherwise, because the allegation was not tested in an adversarial proceeding conforming to the minimum standards of due process, the Court cannot have confidence in a finding of misconduct. In any event, these lamentations about giving respondent-judges the benefit of too much process once again call to mind the colloquy between Sir Thomas More and William Roper in *A Man for All Seasons*:

| ROPER | So now you'd give the Devil benefit of law! |
|---|---|
| MORE | Yes. What would you do? Cut a great road through the law to get after the Devil? |
| ROPER | I'd cut down every law in England to do that! |
| MORE | Oh? And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake. |

[*Dep't of Health & Human Servs v Manke*, 505 Mich 1110, 1111 n 5 (2020) (VIVIANO, J., concurring), quoting Bolt, *A Man for All Seasons* (New York: Vintage Books, 1995), p 66 (stage directions omitted).]

## IV. SANCTION

While I agree with the majority's findings of fact and conclusions of law, I part ways with respect to its sanctions analysis and the six-month suspension it imposes. As will be explained, the *Brown* factors, prior judicial discipline cases, and the severity of the misconduct all lead me to conclude that a twelve-month suspension, accompanied by a public censure, is the appropriate and proportionate sanction.

Regarding the *Brown* factors, I believe that Factor 3 (misconduct prejudicial to the actual administration of justice) and Factor 4 (misconduct that implicates the actual administration of justice or appearance of impropriety) weigh in favor of a more-serious sanction. *In re Brown*, 461 Mich 1291, 1292-1293 (2000). Regarding Count I, respondents' misconduct hindered the ability of others to discover the child abuse that was occurring to her grandsons.[11] This might have been prejudicial to the actual administration of justice, but I agree with the majority that the record does not support a finding that respondent's misconduct actually hindered discovery of the abuse. However, at the very least, her misconduct created an appearance of impropriety. As for Count II, respondent's intentionally false statements in her responses to the JTC's requests for comment were prejudicial to the actual administration of justice. I conclude that these factors weigh heavily in favor of a more-serious sanction. See *In re Simpson*, 500 Mich at 558 (weighing Factors 3 and 4 as supporting a more-serious sanction in part because the respondent "misrepresented certain facts during the JTC investigation"). For these reasons, although

---

[11] It is also worth noting that while perhaps under no legal obligation to report the abuse, respondent was on notice that it was occurring and could have reported the abuse or otherwise acted to protect these children. That she chose to protect her son at the expense of her grandchildren—the innocent victims of the abuse—is profoundly troubling.

I agree with the majority that the factors weigh in favor of a sanction less than removal, I would weigh them to support a greater sanction than the one the majority imposes.

I also disagree that a six-month suspension is proportionate when considering prior judicial discipline cases. Toward the lower end of the spectrum of sanctions we may impose, we have imposed a 90-day suspension along with a public censure for drunk driving. See, e.g., *In re Tabbey*, 497 Mich 900 (2014); *In re Nebel*, 485 Mich 1049 (2010); *In re Steenland*, 482 Mich 1230 (2008). Slightly higher on the spectrum, in *In re Simpson*, 500 Mich at 546-554, 565, we imposed a nine-month suspension and public censure for respondent (1) using his judicial office to interfere with a police investigation, (2) interfering with the prosecution of a criminal case against his intern, and (3) making "an intentional misrepresentation or a misleading statement" not under oath during the JTC proceedings.

The majority believes that a "downward departure" from *In re Simpson* is warranted on the basis of respondent's lack of a history of misconduct and because her false statement did not relate to her conduct as a judge.[12] I disagree that the severity of the misconduct in this case falls between that in the drunk driving cases cited above and *In re Simpson*. Rather, in my view, the misconduct in this case is more severe than that in *In re Simpson*. The misconduct in *In re Simpson* did not result in any harm coming to another individual. But in the present case, respondent's decision to cover up visible injuries on her grandsons on multiple occasions might have delayed the discovery of their father's abuse. Had the

---

[12] It is difficult to understand how respondent's lack of a history of misconduct warrants a downward departure from the sanction imposed in *In re Simpson*, given that the respondent there also had no history of misconduct. *In re Simpson*, 500 Mich at 539.

abuse been discovered earlier, the boys might have been spared from additional instances of abuse, including the abuse that occurred on June 24, 2018, which led to their removal from the home.[13] For these reasons, I believe that a greater sanction than that imposed in *In re Simpson* is warranted. I would impose a twelve-month suspension along with a public censure.[14]

---

[13] That incident was particularly violent, as noted in the Court of Appeals opinion in the termination of parental rights case:

> On June 24, 2018, a 911 telephone call was placed indicating that children were being physically abused. Apparently, an anonymous caller advised that a beating had occurred for over 45 minutes, the activity was "beyond a whipping," and the perpetrator advised that he was going to "kill everybody." Additionally, the perpetrator advised the children to take off their clothes, lay down, and put their head in a pillow to prevent anyone from hearing their crying.
>
> CPS workers and the police arrived at the home, and a male was heard screaming, "[y]ou think you can do whatever you want going behind my back. She doesn't love you. I'm your dad." A police officer encountered respondent who represented that there was one child in the home. The eldest child, then eleven-year-old GD, spoke to the police and said, "[p]lease don't leave us here." The other four children were found upstairs. GD and his brother, then nine-year-old RD, both had visible bruises on their bodies, and they appeared nervous, scared, and fearful. All of the children were physically shaking and repeated that they should not be speaking to the authorities. [*In re Davis-Headd/Prograis*, unpub op at 1-2.]

[14] I also strongly disagree with the majority's apparent willingness to revisit in a future case our rule that a judge's "act of lying under oath categorically renders [him or her] unfit for office." *In re Adams*, 494 Mich 162, 185; 833 NW2d 897 (2013) (quotation marks and citation omitted). Like the majority, I agree that "equivalent misconduct should be treated equivalently." *In re Brown*, 461 Mich at 1292. But I disagree that our categorical rule regarding lying under oath runs afoul of this rule. We have explained the rationale for this rule as follows:

> Our judicial system has long recognized the sanctity and importance of the oath. An oath is a significant act, establishing that the oath taker promises to be truthful. As the "focal point of the administration of justice,"

V. CONCLUSION

In addition to the misconduct found by the majority, I would find that respondent was aware of the child abuse and covered up evidence of the abuse on multiple occasions. Instead of a six-month suspension, a twelve-month suspension is the appropriate and proportionate sanction in light of the *Brown* factors, prior disciplinary cases, and the

---

a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. *When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and becomes unfit to sit in judgment of others.*

Certainly, Judicial Tenure Commission proceedings are intended to be remedial, not penal. The vast majority of misconduct found by the Judicial Tenure Commission is not fatal; rather, it reflects oversight or poor judgment on the part of a fallible human being who is a judge. *However, some misconduct, such as lying under oath, goes to the very core of judicial duty and demonstrates the lack of character of such a person to be entrusted with judicial privilege.*

*Lying under oath, as the respondent has been adjudged to have done, makes him unfit for judicial office.* [*In re Adams*, 494 Mich at 185 (cleaned up; emphasis added).]

The particular circumstances of a case—i.e., what the judge lied under oath about or why he or she lied under oath—are irrelevant to the concerns we expressed in *In re Adams*. Additionally, this Court has consistently and repeatedly removed judges from office when they make misrepresentations under oath. *In re Adams*, 494 Mich at 186 ("This Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath."). See also *In re Ryman*, 394 Mich 637, 642-643; 232 NW2d 178 (1975); *In re Loyd*, 424 Mich 514, 516, 534-536; 384 NW2d 9 (1986); *In re Ferrara*, 458 Mich 350, 365-370, 372-373; 582 NW2d 817 (1998); *In re Noecker*, 472 Mich 1, 13-14; 691 NW2d 440 (2005); *In re Nettles-Nickerson*, 481 Mich 321, 322-323; 750 NW2d 560 (2008); *In re Justin*, 490 Mich 394, 423-424; 809 NW2d 126 (2012); *In re James*, 492 Mich 553, 569-570; 821 NW2d 144 (2012); *In re McCree*, 495 Mich 51, 87; 845 NW2d 458 (2014); *In re Brennan*, 504 Mich 80, 85-86; 929 NW2d 290 (2019). This is not an area of law in need of improvement.

severity of respondent's misconduct.  I respectfully concur with respect to the Court's findings of fact and conclusions of law but dissent with respect to the sanction imposed.

David F. Viviano